**Michael COTTER, Plaintiff,**

v.

**Francis R. OWENS, Individually and as Business Manager of Local 1–2, Utility Workers Union of America, and Local 1–2, Utility Workers Union of America, Defendants.**

**No. 83 Civ. 1431 (RWS).**

United States District Court, S.D. New York.

June 5, 1984.

Hall, Clifton & Schwartz, New York City, for plaintiff; Arthur Z. Schwartz, Susan M. Jennik, New York City, of counsel.

Menagh, Trainor & Bochner, New York City, for defendants; David Stolow, of counsel.

## OPINION

SWEET, District Judge.

Plaintiff Michael Cotter ("Cotter"), an employee of the Consolidated Edison Company of New York, Inc. ("Con Ed"), has filed a complaint against defendant Local 1–2 of the Utility Workers of America ("Local 1–2") and defendant Francis R. Owens ("Owens"), business manager of Local 1–2

during the relevant period.[1] Cotter seeks to compel defendants to reinstate him as a member of Local 1–2's Nuclear Safety Committee ("Safety Committee"). Jurisdiction is invoked under section 412 [2] of the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 401 *et seq.* The defendants have moved for summary judgment pursuant to Fed.R.Civ.P. 56, and upon the following findings of fact and conclusions of law, their motion is granted and summary judgment will be entered dismissing the complaint.

The following facts are undisputed. Cotter was first hired by Con Ed in July 1959. At present, he is a "Mechanic A" in the Power Generation Department at Con Ed's Indian Point Nuclear Power Station ("Indian Point"). Cotter is also a Local 1–2 shop steward, and, according to his deposition, he has long been active in Local 1–2's politics. The record establishes that Cotter is a concerned advocate of worker safety and is often critical of the management of Con Ed and the leadership of Local 1–2.

In April 1978, James Joy ("Joy"), then business manager of Local 1–2, appointed Cotter to the Safety Committee, which Joy created to disseminate safety information to union members, to monitor Con Ed's compliance with federal safety standards, to comment on new regulations and to suggest improvements in safety training and practices. The Safety Committee considers hazards and practices which it feels should be addressed at Indian Point. After establishing an agenda, members of the Safety Committee meet with Con Ed to express its views and seek changes in working conditions. In addition, the Safety Committee has, on occasion, met with national union officers and Nuclear Regulatory Commission officials. Only stewards who represent union members assigned to Indian Point are eligible for Safety Committee membership, but there is no limit to the number of stewards who may be appointed to the committee from each department.

The Safety Committee is not governed by Local 1–2's by-laws, nor does it have independent rules and regulations. Since 1978, several stewards have been removed from the Safety Committee because they were promoted to management positions or were transferred from Indian Point, but Cotter is the only Safety Committee member to be removed against his will. Cotter last attended an Safety Committee meeting on November 20, 1980.

In January 1981, Con Ed discharged Cotter, alleging that he had threatened a supervisor. Cotter brought an administrative action for reinstatement under the "whistle-blower" provision of the Energy Reorganization Act of 1974, 42 U.S.C. § 5851, claiming that the alleged threat was a pretext for discharging him in retaliation for his efforts as an advocate of nuclear safety. On November 5, 1981, the United States Secretary of Labor ordered Con Ed to reinstate Cotter. The Secretary's order was affirmed by the Court of Appeals for the Second Circuit. *Consolidated Edison Co. v. Donovan*, 673 F.2d 61 (2d Cir.1982). In January 1982, Cotter instituted a wrongful discharge action in New York County Supreme Court against Con Ed and two of its supervisors. In April 1982, a default judgment was entered against Con Ed. Cotter returned to work at Indian Point on March 22, 1982.

Although defendants state that Cotter was removed from the Safety Committee shortly after his termination in January 1981, they concede that he first learned of his removal from the Committee on September 15, 1982, when Owens informed him that Joe Summo ("Summo"), assistant business manager of Local 1–2, had reorganized the committee. Arguing that there had been no real reorganization outside of his removal, Cotter made requests to be reinstated to Summo and Owens. After Summo and Owens rejected his requests, Cotter tried unsuccessfully to enlist the aid

---

**1.** In April 1983, Owens became the executive vice president of the national union.

**2.** Section 412 provides a federal cause of action for violations of the Bill of Rights of Members of Labor Organizations, 29 U.S.C. § 411.

of Joy, who had since become the president of the national union.

Since his return in March 1982, Cotter has become more active than ever in union politics. In February, 1982, he helped to found a dissident group within Local 1–2 called the Right to Fight Back Committee ("Fight Back Committee"). The Committee, of which Cotter is chairman, criticizes Local 1–2's management in its newsletter, *The Spark*, and in leaflets. In June 1982, the Fight Back Committee published the first issue of *The Spark*. Page one featured an article titled "Welcome Back Cotter," which dealt with Cotter's reinstatement. Other articles were highly critical of Local 1–2's policies and practices. One accused Local 1–2 of overspending, listed the salaries of the full-time officers of Local 1–2, and encouraged the membership to "cut the fat." Another article reported the efforts of Cotter and other Fight Back Committee members to change Local 1–2's by-laws. In September 1982, The Fight Back Committee published the second issue of *The Spark,* which was also critical of Local 1–2's management. One article attacked the failure of the Safety Committee to meet on a regular basis and to realize its goals.

Cotter filed the complaint in the instant action on February 23, 1983, seeking reinstatement to the Safety Committee. The dispute between the Fight Back Committee and Local 1–2's leadership is also the subject of a separate action before this court in *Fight Back Committee v. Gallagher,* 83 Civ. 8121 (S.D.N.Y.). In that action, the Honorable Robert J. Ward has issued two preliminary injunctions ordering Local 1–2's leadership to allow the Fight Back Committee to propose amendments to Local 1–2's by-laws. Cotter, by his affidavit, states that on February 27, 1984, his efforts to amend Local 1–2's by-laws were again rejected, allegedly in violation of union regulations and the LMRDA.

Cotter alleges that he was removed from the Safety Committee in retaliation for opposing Local 1–2's management and instituting legal action against Con Ed and that

his removal was therefore an infringement of his rights as a union member as set out in sections 411(a)(2) and 411(a)(4) of the LMRDA, thus giving rise to a cause of action under section 412. Section 411(a)(2) provides:

Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: **Provided,** That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

Section 411(a)(4) provides:

No labor organization shall limit the right of any member thereof to institute an action in any court, or in a proceeding before any administrative agency irrespective of whether or not the labor organization or its officers are named as defendants or respondents in such action or proceeding, or the right of any member of a labor organization to appear as a witness in any judicial, administrative, or legislative proceeding, or to petition any legislature or to communicate with any legislator: **Provided,** That any such member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organizations or any officer thereof: **And provided further,** That no interested employer or employer association shall directly or indirectly finance, encourage, or participate in, except as a

party, any such action, proceding, appearance, or petition.

In support of their motion for summary judgment, defendants argue that the record demonstrates that Cotter's removal from the Safety Committee was not retaliatory. As noted above, defendants contend that Cotter was removed from the Safety Committee shortly after Con Ed terminated him in January 1981, since Cotter would no longer be at Indian Point and consequently could not fulfill his responsibilities as a Safety Committee member. Alternatively, defendants contend that even assuming *arguendo* that Cotter's discharge was retaliatory, such an action would not violate the LMRDA under the Supreme Court's decision in *Finnegan v. Leu,* 456 U.S. 431, 102 S.Ct. 1867, 72 L.Ed.2d 239 (1982).

█ No evidence has been submitted to support Cotter's § 411(a)(4) claim that Local 1–2 in any fashion limited his right to bring an action against Con Ed. Moreover, the record does not indicate that Local 1–2 was in any way opposed to Cotter's actions. In fact, Cotter concedes that until his attorney decided to seek administrative relief, Local 1–2 was prepared to conduct arbitration proceedings on his behalf. Accordingly, summary judgment may properly be granted with respect to Cotter's § 411(a)(4) claim. *See, e.g., Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980).

There is a substantial dispute of fact as to whether Cotter was removed in retaliation for his opposition to Local 1–2. Although Owens concedes that he was aware of Cotter's dissident activities, defendants assert that the fact that Cotter's name was deleted from the Safety Committee mailing list in February 1981 establishes that he was removed before these activities began. However, John Odendahl, who served as chairman of the Safety Committee from 1978 until 1982, states in his deposition that

he was never informed that Cotter had been removed. Similarly, there is no mention of Cotter's removal in the minutes of Safety Committee meetings. Finally, no steward from the Power Generation Department, Cotter's working group, was appointed to the Safety Committee until September 1982.

Although defendants have sought to counter these facts, the record must be viewed in the light most favorable to Cotter for the purposes of this motion, and it is therefore assumed that he was removed from the Safety Committee in retaliation for his political activities. *E.g., Hill v. A-T-O, Inc.,* 535 F.2d 1349 (2d Cir.1976). However, notwithstanding this issue, *Finnegan, supra,* in the court's view, bars Cotter's § 411(a)(2) and 411(a)(4) claims. *E.g., Reisner v. General Motors Corp.,* 511 F.Supp. 1167, 1175 (S.D.N.Y.1981), *aff'd,* 671 F.2d 91 (2d Cir.), *cert. denied,* 459 U.S. 858, 103 S.Ct. 130, 74 L.Ed.2d 112 (1982).

In *Finnegan,* a newly elected union president dismissed several of the former president's supporters from their appointed positions as union business agents. The union president maintained that the agents were loyal to his adversary and thus could not be relied upon to implement the new administration's policies. The dismissed agents claimed that the LMRDA protected union officials from retaliatory discharges, and brought suit under the two sections of the LMRDA, 29 U.S.C. §§ 412 and 529.

The Supreme Court rejected the dismissed agents' claim. Analyzing the legislative history of the LMRDA, the Court determined that the act was designed to protect a "union member's rights or status as a member of the union," not his status as a union official or employee. *Finnegan, supra,* 456 U.S. at 437, 102 S.Ct. at 1871. Accordingly, the court held that removal from union office[3] was not "discipline"

---

**3.** There is some question as to whether the holding of *Finnegan* applies only to appointed union officials and not elected representatives of the membership. *Compare Runyun v. United Brotherhood of Carpenters and Joiners,* 554 F.Supp. 859 (D.Colo.1982) *with Brett v. Sohio Construction Co.,* 113 LRRM 2345 (D.Alaska 1983). However, this issue is not relevant to the instant case, inasmuch as Cotter was appointed to the Safety Committee.

within the meaning of § 529.[4] As to the agents' § 412 claim, the Court noted that "a litigant may maintain an action under [§ 412]—to redress an 'infringement' of 'rights secured' under Title I—without necessarily stating a violation of" § 529. *Id.* at 439, 102 S.Ct. at 1872. But the Court held that the retaliatory discharge of policymaking or confidential union employees does not violate LMRDA membership rights and does not give right to a claim under § 412.

For whatever limits Title I places on a union's authority to utilize dismissal from union office as "part of a purposeful and deliberate attempt ... to suppress dissent within the union," *cf. Schonfeld v. Penza*, 477 F.2d 899, 904 (CA2 1973), it does not restrict the freedom of an elected union leader to choose a staff whose views are compatible with his own. Indeed, neither the language nor the legislative history of the Act suggests that it was intended even to address the issue of union patronage. To the contrary, the Act's overriding objective was to ensure that unions would be democratically governed, and responsive to the will of the union membership as expressed in open, periodic elections. *See Wirtz v. Hotel Employees*, 391 U.S. 492, 497 [88 S.Ct. 1743, 1746, 20 L.Ed.2d 763] (1968). Far from being inconsistent with this purpose, the ability of an elect-

ed union president to select his own administrators is an integral part of ensuring a union administration's responsiveness to the mandate of the union election. [footnotes omitted].

*Id.* at 441, 102 S.Ct. at 1873.

Despite this holding, *Finnegan* did not grant union leaders power to discharge any union employee in retaliation for dissident activities. The Court explicitly reserved decision on a critical issue: whether § 412 prohibits the retaliatory discharge of non-policymaking and nonconfidential union employees. *Id.* at 441 n. 11, 102 S.Ct. at 1873.[5] Although the test for determining whether a discharged union employee served in a nonpolicymaking and nonconfidential capacity has yet to be fully developed, *Finnegan* and its progeny suggest that the relevant factors include: 1) whether the employee participated in the development or implementation of union policy; 2) whether the employee worked in an area of vital concern to the membership; 3) the extent to which the employee's disloyalty could hamper his ability to serve the leadership; and 4) the extent to which the employee was privy to confidential information. *See id.* at 442, 102 S.Ct. at 1873 (Blackmun, J. concurring); *Cehaich v. International Union, U.A.W.*, 710 F.2d 234 (6th Cir.1983); *Hodge v. Drivers, Salesmen, Warehousemen, Milk Processors,*

**4.** § 529 provides that:

It shall be unlawful for any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this chapter. The provisions of section 412 of this title shall be applicable in the enforcement of this section.

**5.** Cotter contends that *Finnegan* also left open the question whether a cognizable § 412 claim is presented by an allegation that a union discharged dissident officials as part of an overall plan to suppress dissent within the union. Cotter alleges that Local 1–2 removed him as part of an overall scheme to suppress the Fight Back Committee, as demonstrated by, among other things, the leadership's refusal to entertain amendments to Local 1–2's by-laws. The court rejects the interpretation proposed by plaintiff.

The reference in the passage from *Finnegan* quoted in the text to the "limits" on a union's authority to dismiss dissident employees refers only to the potential exception for nonpolicyholding and nonconfidential employees. It must be remembered that the *Finnegan* Court concluded that a union leader's ability to fulfill his election mandate would be hampered if he lacked the power to remove disloyal administrators. Therefore, an order directing a union to reinstate a dissident policymaking official would run counter to the rationale of *Finnegan*. Moreover, dissident union members may obtain relief from a scheme to suppress dissent even without the rule suggested by Cotter. In the instant case, Cotter and the Fight Back Committee have endeavored to do just that in the action before Judge Ward. *But cf. Parini v. International Brotherhood of Teachers*, 568 F.Supp. 1246, 1249 n. 5 (N.D.Ill.1983).

Cannery, Dairy Employes & Helpers' Local Union 695, 707 F.2d 961 (7th Cir.1983); cf. Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).

In *Cehaich,* the court held that an unpaid union benefits administrator, who, among other things, handled benefits appeals and who had been discharged for anti-leadership activities was a policymaking employee under *Finnegan.* Reasoning that the issues surrounding the rights to benefits are of vital concern to union members, the court held that the union leadership was entitled to remove plaintiff:

> When rank-and-file union members are dissatisfied with the policy positions being taken by benefit representatives in their official capacity, they naturally seek to oust the person or persons responsible for their discontent. Since the union members cannot remove the appointed benefits representative directly, their alternative is to remove the elected union officials responsible for his or her appointment. Union leaders have the right to be assured that appointed administrators are loyally effectuating union policies. Neither the LMRDA nor its legislative history suggest that Congress intended to prohibit elected union officials from protecting their positions from renegade appointed administrators.

*Cehaich, supra,* 710 F.2d at 239 n. 9. In *Hodge,* the court held that a union employee's job must be both nonpolicymaking and nonconfidential to qualify as a possible exception to *Finnegan.* Thus, a secretary who had no policymaking responsibilities but who had access to confidential information came under the general rule of *Finnegan.*

In the instant case, Cotter, as a member of the Safety Committee, was responsible for developing Local 1–2's policy regarding nuclear safety. The minutes of Safety Committee meetings demonstrate that the committee established priorities in training and safety procedures and often met with Con Ed's management to express the concerns of the membership. In meetings that occurred after Cotter's removal, the Safety Committee, officials of the national union and members of the Nuclear Regulatory Commission discussed proposed revisions to the Standards for Protecting Against Radiation, 10 C.F.R. Part 20. Although Cotter was not privy to as much confidential information as the secretary in *Hodge,* on at least one occasion, Safety Committee members were allowed to review confidential reports from the Nuclear Regulatory Commission.

"[S]ummary judgment is improper when the court merely believes that the opposing party is unlikely to prevail on the merits after trial." *American International Group, Inc. v. London American International,* 664 F.2d 348, 351 (2d Cir.1981). However, summary judgment is properly granted where, as here, there is no triable issue of material fact and "the undisputed facts ... establish that the 'moving party is entitled to judgment as a matter of law.'" *S.E.C. v. Research Automation Corp.,* 585 F.2d 31, 35 (2d Cir.1978) (quoting, Fed.R.Civ.P. 56(c)).

■ There is no dispute as to the Safety Committee's activities. What is at issue is the characterization of these activities, and this question may be determined on a motion for summary judgment. *See, e.g., Cehaich, supra,* 710 F.2d at 239. The court concludes that Safety Committee members come under the rule of *Finnegan.* Worker safety is an issue of vital concern to employees at Indian Point. When the leadership of Local 1–2 seeks reelection, they will have to defend their record on this issue. Accordingly, Owens is entitled to select Safety Committee members whose views are compatible with those of the leadership. Moreover, it would be difficult, if not impossible, for the leadership to represent effectively the views of the membership during the Safety Committee's meetings with Con Ed, the national union or federal officials if a Safety Committee member were to use such meetings as a forum to promote an opposition candidacy to the union's leadership.

Under *Finnegan,* a policymaking union official who has been discharged in retalia-

tion for dissident activities can obtain relief under § 412 only if the union has taken additional punitive action which directly infringes upon his rights as a member. *Childs v. Local 18, International Brotherhood of Electrical Workers,* 719 F.2d 1379, 1383–84 (9th Cir.1983); *Sullivan v. Laborers International Union,* 707 F.2d 347, 350 (8th Cir.1983); *Runyan v. United Brotherhood of Carpenters & Joiners,* 554 F.Supp. 859, 862 (D.Colo.1982). In *Sullivan,* a suspended business manager was held to state a claim against a union by alleging that he had been barred from holding union office for three years without due process. The court noted that "by preventing one of its members from seeking union office, a union affects the individual as a union member ...." *Sullivan,* 707 F.2d at 350; *see also Schonfeld v. Penza,* 477 F.2d 899 (2d Cir.1973). In *Runyan, supra,* the court dismissed the first complaint of a discharged union official because it failed to allege a direct impingement on his membership rights. 554 F.Supp. at 862. After the discharged official amended his complaint to include allegations that the union had prohibited him from discussing his removal and excluded him from all union affairs, the court denied the union's motion for summary judgment. *Runyan v. United Brotherhood of Carpenters & Joiners,* 566 F.Supp. 600 (D.Colo.1983).

In the instant case, Cotter has failed to state a § 412 claim. Aside from his removal from the Safety Committee, Cotter has not alleged that his rights as a Local 1–2 member have been limited in any way. Cotter is still a shop steward and thus can initiate and handle grievances, including those arising out of unsafe practices. He has not been prevented from running for union office. Indeed, his alleged exclusion from the Safety Committee has presented a clear-cut political issue. In fact, after his removal from the Safety Committee, Cotter made an unsuccessful bid to become business manager, as part of the Fight Back Committee ticket.

Accordingly, defendants' motion for summary judgment is granted and the clerk is directed to enter judgment dismissing the complaint.

**IT IS SO ORDERED.**